IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| *IN RE:* INTERCONTINENTAL TERMINALS COMPANY LLC DEER PARK FIRE LITIGATION | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | Lead Case No. 4:19-cv-01460<br><br>Related Case Nos.<br><br>4:19-cv-01424; 4:19-cv-01428;<br>4:19-cv-01430; 4:19-cv-01431;<br>4:19-cv-01433; 4:19-cv-01434;<br>4:19-cv-01436; 4:19-cv-01440;<br>4:19-cv-01443; 4:19-cv-01444;<br>4:19-cv-01447; 4:19-cv-01450;<br>4:19-cv-01452; 4:19-cv-01453;<br>4:19-cv-01457; 4:19-cv-01459;<br>4:19-cv-01461; 4:19-cv-01708;<br>4:19-cv-01882; 4:19-cv-01886;<br>4:19-cv-01887; 4:19-cv-01890;<br>4:19-cv-02419; 4:19-cv-02425;<br>4:19-cv-02429; 4:19-cv-02674;<br>4:19-cv-02775; 4:19-cv-03457;<br>4:19-cv-03594; 4:19-cv-03609;<br>4:19-cv-04051; 4:19-cv-05029;<br>4:20-cv-00019; 4:20-cv-00036;<br>4:20-cv-00212; 4:20-cv-00216,<br>4:20-cv-00814; 4:20-cv-01019;<br>4:20-cv-01022; 4:20-cv-01306;<br>4:20-cv-01473; 4:20-cv-01714;<br>4:20-cv-01948; 4:20-cv-01951;<br>4:20-cv-01947; 4:20-cv-01942;<br>4:20-cv-01938; 4:20-cv-01891;<br>4:20-cv-01942; 4:20-cv-01889;<br>4:20-cv-01886; 4:20-cv-01387;<br>4:20-cv-01930; 4:20-cv-01867;<br>4:20-cv-01863; 3:20-cv-00219;<br>3:20-cv-00217; 4:20-cv-02616 |

# DEFENDANT INTERCONTINENTAL TERMINALS COMPANY LLC's
## MOTION FOR SUMMARY JUDGMENT
### REGARDING CLAIMS UNDER THE OIL POLLUTION ACT

TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   BACKGROUND AND UNDISPUTED FACTS........................................3

      A.   The fire at ITC's tank farm results in the discharge of a mixture
           containing oil and various hazardous substances.................................3

      B.   The response efforts of the EPA and USCG culminate in a
           determination that CERCLA covers the Incident. ...............................4

      C.   OPA Plaintiffs file the OPA Actions. ...................................................6

III.  STANDARD OF REVIEW ........................................................................7

IV.   ARGUMENT & AUTHORITIES................................................................8

      A.   CERCLA covers the Incident, rendering OPA inapplicable as a matter
           of law. ..................................................................................................8

           1.   CERCLA and OPA operate as complementary, mutually
                exclusive statutory regimes......................................................8

           2.   An incident involving the mixture of oil and CERCLA-
                regulated substances falls under CERCLA—not OPA. ...........12

           3.   The mixed spill here falls under CERCLA..............................17

      B.   Alternatively, the USCG's decision not to designate ITC as the
           responsible party under OPA bars OPA Plaintiffs' claims................19

V.    CONCLUSION & PRAYER .....................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Alazan-Apache Resident Ass'n v. San Antonio Hous. Auth.*,
  885 F. Supp. 949 (W.D. Tex. 1995)............................................................. 25

*Ambrogi v. Gould, Inc.*,
  750 F. Supp. 1233 (M.D. Pa. 1990) ............................................................. 9

*Amoco Oil Co. v. Borden, Inc.*,
  889 F.2d 664 (5th Cir. 1989) ...................................................................... 13

*ARC Ecology v. U.S. Dep't of Air Force*,
  411 F.3d 1092 (9th Cir. 2005) .................................................................... 24

*B.F. Goodrich Co. v. Murtha*,
  958 F.2d 1192 (2d Cir. 1992)...................................................................... 13

*Big Lagoon Rancheria v. California*,
  789 F.3d 947 (9th Cir. 2015) ...................................................................... 25

*Buffalo Marine Servs. Inc. v. United States*,
  663 F.3d 750 (5th Cir. 2011) ...................................................................... 16

*Chevron, USA, Inc. v. Natural Res. Defense Council*,
  467 U.S. 837 (1984).............................................................................. 14, 16

*Citigroup Inc. v. Fed. Ins. Co.*,
  649 F.3d 367 (5th Cir. 2011) ........................................................................ 8

*Corley v. United States*,
  556 U.S. 303 (2009)..................................................................................... 21

*Denehy v. Mass. Port Auth.*,
  42 F. Supp. 3d 301 (D. Mass. 2014) .......................................................... 22

*Dhuka v. Holder*,
  716 F.3d 149 (5th Cir. 2013) ...................................................................... 14

*Emp'rs Ins. of Wausau v. Browner*,
  848 F. Supp. 1369 (N.D. Ill. 1994), *aff'd*, 52 F.3d 656 (7th Cir. 1995)........................ 9

*Envtl. Integrity Project v. U.S. EPA*,
  __ F.3d __, No. 18-60384, 2020 WL 4686995 (5th Cir. Aug. 13, 2020).................... 15

*Exxon Corp. v. Hunt*,
  475 U.S. 355 (1986) ...................................................................................... 9

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) .................................................................................... 23

*Green v. Life Ins. Co. of N. Am.*,
  754 F.3d 324 (5th Cir. 2014) ......................................................................... 8

*Hibbs v. Winn*,
  542 U.S. 88 (2004) ...................................................................................... 21

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on April 20,
  2010*,
  148 F. Supp. 3d 563 (E.D. La. 2015) .......................................................... 10

*In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mex., on April 20, 2010*,
  808 F. Supp. 2d 943 (E.D. La. 2011), *aff'd sub nom. In re DEEPWATER HORIZON*,
  745 F.3d 157 (5th Cir. 2014) ...................................................................... 24

*In re Oil Spill by Oil Rig "Deepwater Horizon" in Gulf of Mex., on April 20, 2010*,
  MDL 2179, 2020 WL 3606261 (E.D. La. July 2, 2020) ............................. 10

*In re Petition of Settoon Towing LLC*,
  722 F. Supp. 2d 710 (E.D. La. 2010) .......................................................... 10

*In re Settoon Towing, L.L.C.*,
  859 F.3d 340 (5th Cir. 2017) ................................................................. 10, 22

*In re Voluntary Purchasing Grps. Inc. Litig.*,
  No. 3:94-CV-2477-H, 2002 WL 31156535 (N.D. Tex. Sept. 26, 2002) ...... 9

*Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*,
  379 F.3d 293 (5th Cir. 2004) ......................................................................... 8

*LAN/STV v. Martin K. Eby Constr. Co.*,
  435 S.W.3d 234 (Tex. 2014) .......................................................................... 1

*Lorillard v. Pons*,
  434 U.S. 575 (1978) .................................................................................... 15

*Marrero Hernandez v. Esso Standard Oil Co.(P.R.)*,
  597 F. Supp. 2d 272 (D.P.R. 2009) ............................................................. 15

*Mid Valley Bank v. N. Valley Bank*,
  764 F. Supp. 1377 (E.D. Cal. 1991) ............................................................ 15

*Nguyen v. Am. Commercial Lines L.L.C.*,
805 F.3d 134 (5th Cir. 2015) (per curiam)..................................................18, 19, 20, 22

*Robins Dry Dock & Repair Co. v. Flint*,
275 U.S. 303 (1927)...............................................................................................1

*S. Pac. Transp. Co. v. Cal*,
790 F. Supp. 983 (C.D. Cal. 1991) ...............................................................15

*Se. Tex. Envtl., L.L.C. v. BP Amoco Chem. Co.*,
329 F. Supp. 2d 853 (S.D. Tex. 2004) .........................................................9

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)..................................................................................14, 15

*Smith Prop. Holdings, 4411 Connecticut L.L.C. v. United States*,
311 F. Supp. 2d 69 (D.D.C. 2004) ..........................................................23, 25

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004)..............................................................................22

*Trico Marine Operators, Inc. v. Dow Chem. Co.*,
809 F. Supp. 440 (E.D. La. 1992) .............................................................18

*United States v. Alcan Aluminum Corp.*,
755 F. Supp. 531 (N.D.N.Y. 1991).............................................................13

*United States v. Alcan Aluminum Corp.*,
964 F.2d 252 (3d Cir. 1992).......................................................................15

*United States v. Am. Commercial Lines, L.L.C.*,
759 F.3d 420 (5th Cir. 2014) ...............................................................10, 11

*United States v. Amtreco, Inc.*,
846 F. Supp. 1578 (M.D. Ga. 1994) ........................................................15

*United States v. Backlund*,
689 F.3d 986 (9th Cir. 2012) ....................................................................25

*United States v. E.R.R. LLC*,
417 F. Supp. 3d 789 (E.D. La. 2019).......................................................11

*United States v. Mead Corp.*,
533 U.S. 218 (2001).................................................................................16

*United States v. Mottolo,*
   695 F. Supp. 615 (D.N.H. 1988) ...................................................................... 4

*United States v. Nature's Way Marine L.L.C.,*
   904 F.3d 416 (5th Cir. 2018) .................................................... 11, 13, 18, 25

*United States v. W. Processing Co.,*
   761 F. Supp. 713 (W.D. Wash. 1991) ........................................................... 15

*White Plains Hous. Auth. v. Getty Props. Corp.*, No. 13-CV-6282 NSR, 2014 WL
   7183991 (S.D.N.Y. Dec. 16, 2014) ............................................................... 15

## STATUTES

5 U.S.C. § 702 ............................................................................................ 25

5 U.S.C. § 703 ............................................................................................ 25

5 U.S.C. § 706 ............................................................................................ 25

26 U.S.C. § 9509 ..................................................................................... 6, 10

33 U.S.C. § 2701 ...................................................................... 12, 15, 18, 20

33 U.S.C. § 2702 ...................................................................... 10, 11, 18

33 U.S.C. § 2706 ...................................................................... 16, 17

33 U.S.C. § 2709 ............................................................................................ 11

33 U.S.C. § 2712 ...................................................................... 6, 11, 22, 24

33 U.S.C. § 2713 ...................................................................... 11, 20, 21, 23

33 U.S.C. § 2714 ...................................................................... 19, 20, 21, 23

42 U.S.C. § 9601 ...................................................................... 9, 11, 13

42 U.S.C. § 9607 ............................................................................................ 9

42 U.S.C. § 9613 ............................................................................................ 9

42 U.S.C. § 9651 ............................................................................................ 17

## OTHER AUTHORITIES

15 C.F.R. § 990.20 .................................................................................. 5, 16

33 C.F.R. § 136.03................................................................................................... 20

33 C.F.R. § 136.305................................................................................................. 19

40 C.F.R. Part 261 .................................................................................................... 9

40 C.F.R. § 300.3..................................................................................................... 11

40 C.F.R. § 300.110................................................................................................. 11

40 C.F.R. § 300.120................................................................................................. 11

43 C.F.R. § 11.10..................................................................................................... 16

Addison J. Schreck, *Empaneling the Peers of Polluters: Obtaining A Jury Trial Under the OPA and CERCLA As Explained in* United States v. Viking Resources, Inc., 2 KY. J. EQUINE, AGRIC. & NAT. RESOURCES L. 293 (2010) ................................................. 12

Cohen, et al., *The Role of Indian Tribes in Recovering Natural Resource Damages Under CERCLA and the Oil Pollution Act*, 2017 NO. 4 RMMLF-INST 9 (Sept. 26, 2017) ................................................................................................................. 12, 15

Donald W. Stever, *3 Law of Chemical Reg. And Hazardous Waste* § 6:4 (July 2000) .... 11

EPA Gen. Counsel Memo, *Applicability of CERCLA to Contamination of Ground Water by Diesel Oil*, 1982 WL 45412 (Dec. 2, 1982) ....................................................... 5, 14

FED. R. CIV. P. 56 ....................................................................................................... 8

House Conference Report, 136 Cong. Rec. H6210, 6220 (daily ed. Aug. 1, 1990) ........ 12

J. Terence Ryan, *The Evolution of Natural Resource Damage Assessments Under the Oil Pollution Act and the Comprehensive Environmental Response, Compensation, and Liability Act*, 6 FORDHAM ENVTL. L.J. 29 (1994) ...................................................... 12

Memo of EPA Gen. Counsel, *Scope of the CERCLA Petroleum Exclusion Under Sections 101(14) and 104(a)(2)*, 1987 WL 123926 (July 31, 1987)......................................... 14

*Memorandum of Understanding: Procedures for United States Coast Guard Access to 8 Superfund, to Support Coast Guard Implementation of CERCLA* (Aug. 17, 1994).... 11

*Memorandum of Understanding: For use of the Oil Spill Liability Trust Fund* (June 11, 2012) ..................................................................................................................... 11

Michael J. Uda, *The Oil Pollution Act of 1990: Is There A Bright Future Beyond Valdez?*, 10 VA. ENVTL. L.J. 403 (1991) ................................................................................ 12

*Notification Requirements; Reportable Quantity Adjustments*, 50 Fed. Reg. 13456, 13460, 1985 WL 86718 (Apr. 4, 1985) (codified at 40 C.F.R. Parts 117 & 302) ....... 14

S. Rep. No. 96–848, 96th Cong. 2d Sess. 29–30 (1980) .................................................... 14

*Uncharted Waters—the path to recovery for business interruption related to oil spills* (Apr. 11, 2019) ......................................................................................................... 2, 22

Defendant Intercontinental Terminals Company LLC ("ITC") files this motion for summary judgment on OPA Plaintiffs'[1] claims brought under the Oil Pollution Act, referred to collectively as the "OPA Actions."

## I.     INTRODUCTION

These consolidated actions arise out of a March 2019 fire at ITC's terminal storage facility and the subsequent discharge of a mixture of oil and other chemical substances into the Houston Ship Channel.  A wide array of plaintiffs assert Texas-law tort claims against ITC for damages allegedly caused by the incident.[2]  Some seek damages for personal injuries, while commercial plaintiffs seek to recover economic losses.  Commercial plaintiffs face the high bar of Texas's "economic loss rule," which provides that there is "no general duty to avoid the unintentional infliction of economic loss."  *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 241 (Tex. 2014) (quoting RESTATEMENT (THIRD) OF TORTS, Tentative Draft § 1); *cf. Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 309–10 (1927) (barring recovery of pure economic losses in the maritime context).

The plaintiffs relevant to this motion (OPA Plaintiffs) are commodities traders and marketers that allegedly suffered economic losses due to the closure of the Houston Ship Channel following the incident.  But unlike the other commercial plaintiffs, OPA Plaintiffs

---

[1] "OPA Plaintiffs" refers to those plaintiffs in *Texas Aromatics, LP v. Intercontinental Terminals Company LLC*, Case No. 4:20-cv-01387; *Castleton Commodities Merchant Trading, LP, et al. v. Intercontinental Terminals Company LLC*, Case No. 4:20-cv-01930; *Gunvor USA LLC v. Intercontinental Terminals Company LLC*, Case No. 4:20-cv-01867; and *Rio Energy International, Inc. v. Intercontinental Terminals Company LLC*, Case No. 4:20-cv-01863.

[2] *E.g., Munoz, et al. v. Intercontinental Terminals Company, LLC*, Case No. 4:19-cv-1460; *Vopak Terminal Deer Park Inc. v. Intercontinental Terminals Company, LLC*, Case No. 4:19-cv-01890; *Coal City Cob Company, Inc. v. Intercontinental Terminals Company, LLC*, Case No. 4:19-cv-03594.

seek to evade Texas's economic-loss rule by suing under the Oil Pollution Act ("OPA"). *See Uncharted Waters—the path to recovery for business interruption related to oil spills* ("*Uncharted Waters*") (Apr. 11, 2019) (article authored by OPA Plaintiffs' counsel about the ITC Incident, explaining that the "economic loss rule . . . can be overcome . . . under the Oil Pollution Act").[3]

OPA Plaintiffs' gambit fails because OPA does not apply as a matter of law to this incident.  Mixed discharges—those that contain both oil and EPA-regulated "hazardous substances"—are covered exclusively by another federal environmental statute: the Comprehensive Environmental, Response, Compensation, and Liability Act ("CERCLA"). And it is undisputed that the discharge from ITC's facilities contained such a mixture. Consequently, the EPA and United States Coast Guard ("USCG")—the agencies charged with managing the cleanup process—determined that CERCLA and not OPA applies.  The USCG thus declined to designate ITC a "responsible party" under OPA—a condition precedent to allowing private damages claims.  The agencies' reasoned analysis relied on text, legislative history, decades of case law, and 30 years of settled agency practice.[4]

OPA Plaintiffs disagree with the expert agencies' judgment, but their novel position defies all authority and would upend the orderly process the agencies have developed for environmental remediation.  Under established principles of textual interpretation and agency deference, this Court should defer to the agencies' reasonable approach.  Because

---

[3] https://us.eversheds-sutherland.com/mobile/NewsCommentary/Legal-Alerts/220040/Uncharted-watersthe-path-to-recovery-for-business-interruption-related-to-oil-spills (last visited on Sept. 2, 2020).

[4] Ex. 1, MACS Claim Summary/Determination; Ex. 2, Kolmar Claim Summary/Determination.

OPA Plaintiffs' claims fail as a matter of law, the Court should grant summary judgment.

## II.    BACKGROUND AND UNDISPUTED FACTS

**A.    The fire at ITC's tank farm results in the discharge of a mixture containing oil and various hazardous substances.**

ITC operates a facility in La Porte, Texas that stores various petrochemical liquids and gases, as well as fuel oil, bunker oil, and distillates.  Ex. 3, 8/5/19 NRDA Preassessment Screen ("NRDA Preassessment") at 1; Texas Aromatics Complaint ("Compl.") ¶ 1.[5]  On March 17, 2019, a fire began in ITC's Second 80's tank farm that eventually compromised the storage tanks in the First and Second 80's tank farms.  Compl. ¶¶ 3–4, 17–18.  Those tank farms are depicted below, along with the relevant products affected at the time of the fire:



Ex. 4, Tank Farm Map; *see also* Ex. 5, 3/19/19–4/719 EPA Pollution Report ("EPA POLREP") ¶ 1.1.2 (explaining that tanks containing "Naphtha, Xylene, Toluene, Gasoline Blendstock, Pyrolysis Gasoline, and Base Oil have caught fire").  As emergency crews

---

[5] Representative citations will be from the *Texas Aromatics* complaint, as all four OPA complaints are nearly identical.

worked to control the fire, a mixture of the various tank products, fire water, and firefighting foam accumulated in ITC's secondary containment area.  Ex. 6, 8/5/19 Notice of Intent to Perform NRDA ("NRDA NOI") at 1; Compl. ¶ 4.

On March 22, 2019, the secondary containment wall was breached, causing an estimated 470,000 to 523,000 barrels of "a mixture of fire water, firefighting aqueous film forming foams (AFFF), and remaining benzene, ethylbenzene, naphtha, xylene, toluene, pyrolysis gas (pygas) and other refined base oils" to be released into Tucker Bayou, Buffalo Bayou, the San Jacinto River, and the Houston Ship Channel.  Ex. 6, NRDA NOI at 1; Compl. ¶ 5.  The ITC fire, containment-wall breach, and resulting discharge will be referred to collectively as "the Incident."

## B.  The response efforts of the EPA and USCG culminate in a determination that CERCLA covers the Incident.

Following the Incident, the EPA coordinated response efforts with both federal and state agencies, including the USCG and Texas Commission on Environmental Quality ("TCEQ").  Compl. ¶¶ 5, 24, 35.  Of the 50 chemicals released, the agencies determined that 17 were hazardous substances "on the Consolidated List of Lists under CERCLA" and 5 were "listed on OPA['s] List of Petroleum and Non-Petroleum Oils."[6]  Ex. 3, NRDA Preassessment at 4, 6.  Before any sampling of the discharged chemicals could be performed, the EPA initially opened both a "CERCLA fund" account and an account with the Oil Spill Liability Trust Fund ("OSLTF") administered under OPA, given the presence

---

[6] *See United States v. Mottolo*, 695 F. Supp. 615, 623 (D.N.H. 1988) (explaining that "xylene" and "toluene" are "substances listed in 40 C.F.R. Part 261 as being hazardous" under CERCLA).

of both hazardous substances and oil.  Ex. 7, 12/3/20 USCG Memo ("USCG Memo").

However, "sampling, on or about March 26, 2019 [by] TCEQ" confirmed that "the substance in the canal was oil *mixed with* hazardous substances, making it a CERCLA product."[7]  In turn, "[o]nce the funding for the response was determined to be CERCLA, the [OPA Account] was closed" and "transferred . . . to form a unilateral CERCLA account."  Ex. 5, EPA POLREP at 14 ¶ 2.4 (first quote);  Ex. 7, USCG Memo (second quote).  In short, "while [certain response accounts] began as OPA cases," EPA and USCG both "later determined that *this was a CERCLA incident*."  Ex. 7, USCG Memo (emphasis added); *see also* Ex. 8, EPA Letter at 2 (confirming EPA's "CERCLA response authority").

The joint determination to proceed with the cleanup of the mixed discharge under CERCLA instead of OPA was consistent with longstanding agency guidance.  *See, e.g.*, EPA Gen. Counsel Memo, *Applicability of CERCLA to Contamination of Ground Water by Diesel Oil*, 1982 WL 45412, at *1 (Dec. 2, 1982) ("If the hazardous substance and the petroleum product are so commingled that, as a practical matter, they cannot be separated, then the entire oil spill would come under CERCLA's jurisdiction."); Ex. 9, Oil Spill Liability Trust Fund (OSLTF) Funding for Oil Spills ("OSLTF Report") at 6 (Jan. 2006) (explaining that "[i]f the substances become so co-mingled that they cannot be separated, [CERCLA] Superfund is used to clean the spill" instead of "the OSLTF"); 15 C.F.R. § 990.20(a)–(c) (providing that for "natural resource damages resulting from a discharge

---

[7] Ex. 7, USCG Memo (emphasis added); *see also* Ex. 8, 9/27/19 EPA Letter attached to 10/24/19 Texas Aromatics Denial Letter ("EPA Letter") at 2 (identifying "sampling data indicating a release or a threat of a release of CERCLA-listed hazardous substances, including but not limited to toluene, benzene, xylene, naphthalene, ethylbenzene and styrene").

or release of a *mixture* of oil and hazardous substances, trustees must use [the CERCLA regulations contained in] 43 CFR part 11" to assess natural-resources damages instead of regulations geared at "oil discharges covered by OPA") (emphasis added).   The governmental response and remedial process continues under CERCLA to this day.

Consistent with that treatment, the USCG, acting through the National Pollution Funds Center ("NPFC"), has denied claims seeking recovery from the OSLTF stemming from the Incident.[8]  Ex. 1, MACS Claim Summary/Determination; Ex. 2, Kolmar Claim Summary/Determination.   In doing so, the NPFC noted that the Incident involved the discharge of a "mixture" of "chemicals and oil" that had "commingled inside the containment area surrounding the tanks," meaning "the spill was a release of hazardous substances" under CERCLA.  *Id.*  The NPFC thus concluded that the claims were "not compensable under OPA" because the discharge of "a commingled mixture of oil and hazardous substances . . . does not fall under OPA."  *Id.*

## C.    OPA Plaintiffs file the OPA Actions.

Between June and August of 2019, OPA Plaintiffs sent demand letters to ITC claiming OPA damages, for purely economic losses.  *E.g.*, Compl. ¶ 56.  OPA Plaintiffs are commodities traders and marketers and claim to have suffered economic losses due to interruptions in their business activities purportedly caused by closures of the Houston Ship Channel.  *E.g.*, *id.* ¶¶ 15, 70.  ITC denied their claims for three reasons: (1) a mixture of oil and CERCLA-regulated hazardous substances falls under CERCLA, not OPA; (2) the

---

[8] The OSLTF was authorized by OPA and can be used for, among other things, the payment of damages claims arising from a spill regulated by OPA.  26 U.S.C. § 9509(c)(1)(A); 33 U.S.C. § 2712(a)(4).

USCG's decision not to designate ITC as a "responsible party" under OPA barred third-party damages claims against ITC; and (3) OPA Plaintiffs' claimed economic losses were not otherwise recoverable under tort or maritime law.  Ex. 10, 10/18/19 Rio Energy Denial Letter; Ex. 11, 10/18/19 Gunvor USA Denial Letter; Ex. 12, 10/19/19 Castleton Commodities Denial Letter; Ex. 8, 10/24/19 Texas Aromatics Denial Letter.

Undeterred by the EPA and USCG determinations that CERCLA exclusively applies (a determination that has now also been confirmed by the NPFC), OPA Plaintiffs filed the OPA Actions, asserting claims for (1) monetary damages under OPA and (2) declaratory relief that OPA applies; ITC is a "Responsible Party" thereunder; and the economic loss rule does not apply.  Compl. ¶¶ 48–69.  The plaintiff in *Texas Aromatics, LP v. Intercontinental Terminals Company LLC*, Case No. 4:20-cv-01387, filed its complaint on April 17, 2020, and others filed shortly thereafter.[9]

Following consolidation of the OPA Actions with the other previously filed actions arising out of the Incident, OPA Plaintiffs and ITC jointly sought leave for ITC to file a motion for summary judgment addressing threshold legal barriers to the OPA Actions. *Munoz*, Case No. 4:19-cv-01460, Dkt. 377.  With the Court's leave, *Munoz*, Dkt. 382, ITC now files this motion for summary judgment seeking dismissal of the OPA Actions.

### III.   STANDARD OF REVIEW

"Summary judgment is appropriate when 'there is no genuine dispute as to any

---

[9] The plaintiffs in *Gunvor USA LLC v. Intercontinental Terminals Company LLC*, Case No. 4:20-cv-01867, and *Rio Energy International, Inc. v. Intercontinental Terminals Company LLC*, Case No. 4:20-cv-01863, each filed their complaints on May 28, 2020.  And the plaintiffs in *Castleton Commodities Merchant Trading, LP, et al. v. Intercontinental Terminals Company LLC*, Case No. 4:20-cv-01930, filed their complaint on June 2, 2020.

material fact and the movant is entitled to judgment as a matter of law.'" *Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 329 (5th Cir. 2014) (quoting FED. R. CIV. P. 56(a)).  Once the movant makes that showing, "the burden shifts to the nonmovant to provide specific facts showing the existence of a genuine issue for trial." *Citigroup Inc. v. Fed. Ins. Co.*, 649 F.3d 367, 371 (5th Cir. 2011) (citing Fed. R. Civ. P. 56(c), (e)).  The nonmovant must then "identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004).

## IV.    ARGUMENT & AUTHORITIES

### A.    CERCLA covers the Incident, rendering OPA inapplicable as a matter of law.

The OPA Actions ostensibly rest on the premise that any spill of oil gives rise to OPA coverage—no matter whether the spill consists of a mixture of oil with CERCLA-regulated "hazardous substances."  That fundamental premise of OPA Plaintiffs' claims is foreclosed by the text and structure of CERCLA's and OPA's statutory regimes, relevant agency interpretations, and judicial decisions nationwide.  Consequently, the EPA and USCG were eminently correct in determining that the mixed spill at issue here falls exclusively within the purview of CERCLA.  OPA Plaintiffs' invocation of OPA fails as a matter of law.

### 1.    CERCLA and OPA operate as complementary, mutually exclusive statutory regimes.

Congress passed CERCLA in 1980 to accomplish "two goals: the cleanup of the nation's hazardous waste sites and allocation of financial responsibility for such cleanup

among responsible parties." *Se. Tex. Envtl., L.L.C. v. BP Amoco Chem. Co.*, 329 F. Supp. 2d 853, 863 (S.D. Tex. 2004). CERCLA serves those purposes by "establish[ing] a trust fund, commonly known as 'Superfund,'" which finances "government response" in "clean[ing] up releases of hazardous substances" and pays "claims" arising out of such releases—*i.e.*, reimbursing (1) private parties for response costs incurred or (2) the government for natural resource damages. *Exxon Corp. v. Hunt*, 475 U.S. 355, 359–60 (1986). CERCLA encompasses "hazardous substances" cross-referenced in other statutory regimes (*e.g.*, the Clean Water Act) as well as those listed by the EPA—the agency tasked with administering CERCLA. 42 U.S.C. § 9601(14); *see generally* 40 C.F.R. Part 261.

CERCLA also creates limited private rights of action for "non-responsible part[ies]" to bring "cost recovery suit[s]" against "potentially responsible parties," and for those potentially responsible parties, in turn, to seek "contribution" against other potentially responsible parties or reimbursement from the federal government.[10] But CERCLA's narrow private right of action for non-responsible parties is limited to environmental-remediation costs; it does not provide for the recovery of purely economic losses. 42 U.S.C. § 9607(a); *see Ambrogi v. Gould, Inc.*, 750 F. Supp. 1233, 1248 (M.D. Pa. 1990) ("[C]ourts have consistently held that Congress did not intend CERCLA to be utilized as a means to recover 'economic loss' for civil damages that a private party may seek as part of a toxic tort action.").

---

[10] *In re Voluntary Purchasing Grps. Inc. Litig.*, No. 3:94-CV-2477-H, 2002 WL 31156535, at *2 (N.D. Tex. Sept. 26, 2002); 42 U.S.C. §§ 9607, 9613; *see also Emp'rs Ins. of Wausau v. Browner*, 848 F. Supp. 1369, 1373 (N.D. Ill. 1994) (explaining that the potentially responsible party may "petition the EPA for reimbursement of the funds it expended"), *aff'd*, 52 F.3d 656 (7th Cir. 1995).

Congress passed OPA in 1990 to "provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills with the petroleum industry." *In re Petition of Settoon Towing LLC*, 722 F. Supp. 2d 710, 713 (E.D. La. 2010) (internal quotation marks omitted).  It imposes liability on "each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters." 33 U.S.C. § 2702.  OPA accomplishes its cleanup and compensation goals in part by establishing the OSLTF, "a public trust fund administered by the" USCG.  *In re Oil Spill by Oil Rig "Deepwater Horizon" in Gulf of Mex., on April 20, 2010*, MDL 2179, 2020 WL 3606261, at *1 (E.D. La. July 2, 2020).  The OSLTF is funded by, among other things, the "environmental tax on petroleum," 26 U.S.C. § 9509, and is available to "finance . . . Federal administrative, operational, and personnel costs and expenses . . . with respect to prevention, removal, and enforcement related to oil discharges." *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on April 20, 2010*, 148 F. Supp. 3d 563, 578 (E.D. La. 2015).

OPA also provides a mechanism for innocent parties to recover damages—including economic losses.  Such a plaintiff must first present its claims to the entity or entities "designated" as the "responsible party" by the USCG.[11]  If the responsible party denies payment, the plaintiff has the option to sue the responsible party in federal court or seek recovery from the OSLTF.  *United States v. Am. Commercial Lines, L.L.C.*, 759 F.3d

---

[11] OPA refers to "the President" making these designation decisions, but "[i]n 1991, the President delegated that duty to the Coast Guard." *In re Settoon Towing, L.L.C.*, 859 F.3d 340, 344 (5th Cir. 2017).  In administering OPA, the USCG often acts through its NPFC division.  Unless otherwise indicated, this motion will refer to the USCG and/or its NPFC counterpart as simply the "USCG."

420, 425 (5th Cir. 2014); 33 U.S.C. § 2713.  Finally, OPA creates a scheme of subrogation that allows the OSLTF to seek recoupment from responsible parties and, in turn, allows responsible parties to seek contribution from other responsible parties or reimbursement from the Government if they present a valid defense or overpay beyond OPA's liability limits.  *Am. Commercial Lines*, 759 F.3d at 425; 33 U.S.C. §§ 2709, 2712(f); *United States v. Nature's Way Marine L.L.C.*, 904 F.3d 416, 418 & n.3 (5th Cir. 2018).

CERCLA and OPA are thus "similar and analogous environmental cleanup statute[s]" administered via separate funding sources.[12]  *United States v. E.R.R. LLC*, 417 F. Supp. 3d 789, 794 (E.D. La. 2019).  But what matters here is the key difference between the two schemes: the *scope* of their coverage.  CERCLA applies to releases of "hazardous substances," which include "any element, compound, mixture, solution, or substance designated" under CERCLA or its regulations, but *exclude* "petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance."  42 U.S.C. § 9601(14).  OPA, on the other hand, applies exclusively to the discharge of "oil," 33 U.S.C. § 2702(a), a term that includes "oil of any kind or in

---

[12] Administration of CERCLA and OPA takes place through the "National Contingency Plan," 40 C.F.R. § 300.3, and more specifically through a "National Response Team" chaired by EPA and vice-chaired by the USCG, *id.* § 300.110. In responding to a spill, the EPA and USCG "jointly" designate an "on scene coordinator" whose "functions are to maintain a local response plan, oversee private cleanup activities, and direct or coordinate federally funded cleanups." Donald W. Stever, 3 *Law of Chemical Reg. And Hazardous Waste* § 6:4 (July 2000) (quoting 40 C.F.R. § 300.120). And, through a series of memoranda of understanding, the EPA and USCG have agreed to jointly coordinate the relevant funding mechanism (Superfund or OSLTF) as the circumstances require.  *See Memorandum of Understanding: Procedures for United States Coast Guard Access to 8 Superfund, to Support Coast Guard Implementation of CERCLA* (Aug. 17, 1994), https://www.uscg.mil/Portals/0/NPFC/docs/PDFs/urg/App/EPA_CERCLA_MOU_AppA_02.pdf; *Memorandum of Understanding: For use of the Oil Spill Liability Trust Fund* (June 11, 2012), https://www.uscg.mil/Portals/0/NPFC/docs/PDFs/urg/App/EPA_OSLTF_MOU_AppA_01.pdf.

any form, including petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil," but *excludes* "any substance which is specifically listed or designated as a hazardous substance under [CERCLA] and which is subject to the provisions of that Act." *Id.* § 2701(23).

Those reciprocal exclusions—CERCLA excluding petroleum from its scope, and OPA excluding CERCLA substances—ensure that "there will be *no overlap* in the liability provisions of CERCLA and the Oil Pollution Act." House Conference Report, 136 Cong. Rec. H6210, 6220 (daily ed. Aug. 1, 1990) (emphasis added). In other words, "OPA and CERCLA [we]re designed to be *mutually exclusive*" regimes. J. Terence Ryan, *The Evolution of Natural Resource Damage Assessments Under the Oil Pollution Act and the Comprehensive Environmental Response, Compensation, and Liability Act*, 6 FORDHAM ENVTL. L.J. 29, 32–33 (1994) (emphasis added).[13] An OPA discharge thus cannot give rise to CERCLA liability, and, more relevant here, a CERCLA discharge cannot give rise to OPA claims. Indeed, it would be practically impossible for dual liability to spring from the same discharge, given the divergent funding and statutory procedures for recovery erected under CERCLA and OPA.

### 2. An incident involving the mixture of oil and CERCLA-regulated substances falls under CERCLA—not OPA.

---

[13] *See also, e.g.*, Cohen, et al., *The Role of Indian Tribes in Recovering Natural Resource Damages Under CERCLA and the Oil Pollution Act*, 2017 NO. 4 RMMLF-INST 9 , 9-4 (Sept. 26, 2017) ("[T]he statutes are thought of as mutually exclusive—i.e., a release or discharge will not trigger both statutes."); Michael J. Uda, *The Oil Pollution Act of 1990: Is There A Bright Future Beyond Valdez?*, 10 VA. ENVTL. L.J. 403, 425 n.168 (1991) (explaining that Congress "defined the term 'oil' to clarify that the term is mutually exclusive from hazardous substances subject to regulation under . . . CERCLA" (quoting 136 Cong. Rec. H6933, 6939 (daily ed. August 3, 1990))) (alteration in original); Addison J. Schreck, *Empaneling the Peers of Polluters: Obtaining A Jury Trial Under the OPA and CERCLA As Explained in* United States v. Viking Resources, Inc., 2 KY. J. EQUINE, AGRIC. & NAT. RESOURCES L. 293, 294 (2010) (explaining that "the scope of each act is mutually exclusive").

That statutory framework tees up the dispositive question presented: Under which mutually exclusive scheme does a *mixture* of oil and CERCLA-regulated hazardous substances fall?  As with any "question of statutory interpretation," the analysis "begin[s] with the text of the statute."  *Nature's Way Marine*, 904 F.3d at 420.  Starting with CERCLA (which predated OPA by a decade), its definition of "hazardous substance" explicitly includes "any element, compound, *mixture*, *solution*, or substance designated." 42 U.S.C. § 9601(14) (emphasis added).  Based on that plain language, courts have consistently concluded that "[w]hen a mixture or waste solution contains hazardous substances, that *mixture is itself hazardous* for purposes of determining CERCLA liability."  *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1201 (2d Cir. 1992) (emphasis added) (collecting cases).  In other words, CERCLA's coverage "depends only on the presence in any form of listed hazardous substances."  *Id.*; *see also Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 669 (5th Cir. 1989) ("The plain statutory language fails to impose any quantitative requirement on the term hazardous substance and we decline to imply that any is necessary.").

To be sure, CERCLA expressly excludes "petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance" from its definition of hazardous substance.  42 U.S.C. § 9601(14).  But CERCLA's "petroleum exclusion" does not override CERCLA's rule that all mixtures including hazardous substances are covered by CERCLA.  *United States v. Alcan Aluminum Corp.*, 755 F. Supp. 531, 539 (N.D.N.Y. 1991) (explaining that "a plain reading of this 'exclusionary' provision does not warrant inclusion of oil which has become

contaminated with hazardous substances through use"); S. Rep. No. 96–848, 96th Cong. 2d Sess. 29–30 (1980) (explaining that the petroleum exclusion applies to "releases *strictly of oil*") (emphasis added).  Indeed, it would be anomalous to hold that CERCLA excludes mixtures of oil with hazardous substances while covering mixtures of hazardous substances with other substances that, like oil, would also fall outside CERCLA on their own.

EPA, the expert agency charged with administering CERCLA, agrees.  For 38 years—nearly CERCLA's entire history—EPA has consistently interpreted CERCLA to cover "mixtures of petroleum and other toxic materials" and "hazardous substances which are added to or mixed with petroleum products."  Memo of EPA Gen. Counsel, *Scope of the CERCLA Petroleum Exclusion Under Sections 101(14) and 104(a)(2)*, 1987 WL 123926, at *2, 4 (July 31, 1987).[14]  Concomitantly, EPA holds that CERCLA's "petroleum exclusion" applies only to releases "*strictly* of oil."  *Id.* (quoting S. Rep. No. 96–848).  The authoritative interpretation in the 1987 General Counsel Memo continues to guide EPA actions to this day.[15]

EPA's longstanding interpretation is consistent with the statute and should be accorded appropriate deference under *Chevron* and *Skidmore*.[16]  And indeed, EPA's

---

[14] The 1987 General Counsel Memo is the fullest explanation of an interpretation that dates back to a 1982 guidance memo and a 1985 notice-and-comment regulation.  *See* EPA Gen. Counsel Memo, *Applicability of CERCLA to Contamination of Ground Water by Diesel Oil*, 1982 WL 45412, at *1 (Dec. 2, 1982) ("If the hazardous substance and the petroleum product are so commingled that, as a practical matter, they cannot be separated, then the entire oil spill would come under CERCLA's jurisdiction."); *Notification Requirements; Reportable Quantity Adjustments*, 50 Fed. Reg. 13456, 13460, 1985 WL 86718 (Apr. 4, 1985) (codified at 40 C.F.R. Parts 117 & 302) ("EPA does not consider materials such as waste oil to which listed CERCLA substances have been added to be within the petroleum exclusion.").

[15] *See Scope of the CERCLA Petroleum Exclusion Under Sections 101(14) and 104(a)(2)*, https://www.epa.gov/enforcement/guidance-scope-cercla-petroleum-exclusion (last visited on Sept. 2, 2020).

[16] *Chevron, USA, Inc. v. Natural Res. Defense Council*, 467 U.S. 837, 842–45 (1984) (court may not substitute its interpretation of ambiguous statute for reasonable agency interpretation); *Dhuka v. Holder*, 716 F.3d 149, 154 (5th

interpretation *has* been accorded deference and adopted in many cases across the country. *White Plains Hous. Auth. v. Getty Props. Corp.*, No. 13-CV-6282 NSR, 2014 WL 7183991, at *10 (S.D.N.Y. Dec. 16, 2014) ("[T]he EPA's interpretation of the petroleum exclusion is entitled to substantial deference.").[17]

Congress enacted OPA in 1990 against this well-established interpretive backdrop to create a mechanism for controlling and remedying damages caused by "oil" spills, without upsetting CERCLA's pre-existing regulation of hazardous substances. *See* Cohen et al., *supra* at n.13 (explaining that Congress intended OPA to "fill[] a gap left by CERCLA's petroleum exclusion"). Congress thus excluded from OPA's definition of "oil" all "substance[s] which [are] specifically listed or designated as a hazardous substance under" CERCLA. 33 U.S.C. § 2701(23). In enacting this exclusion, Congress was aware of the established understanding of CERCLA's scope and thereby excluded all mixtures of oil and CERCLA "hazardous substances" from OPA's coverage. *See Lorillard v. Pons*, 434 U.S. 575, 581 (1978) ("Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.").

---

Cir. 2013) (deferring to EPA interpretation due to its "thoroughness . . . , [the] validity of its reasoning, [and] its consistency") (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also Envtl. Integrity Project v. U.S. EPA*, __ F.3d __, No. 18-60384, 2020 WL 4686995, at *6 (5th Cir. Aug. 13, 2020) (deferring to EPA interpretation premised on statutory "text, . . . structure and purpose").

[17] *See, e.g.*, *Marrero Hernandez v. Esso Standard Oil Co.(P.R.)*, 597 F. Supp. 2d 272, 289 (D.P.R. 2009) ("[H]azardous substances which are added to petroleum or which increase in concentration solely as a result of contamination of the petroleum during use are not part of the 'petroleum' and thus are not excluded from CERCLA." (quoting *S. Pac. Transp. Co. v. Cal*, 790 F. Supp. 983, 986 (C.D. Cal. 1991)); *United States v. Amtreco, Inc.*, 846 F. Supp. 1578, 1584–85 (M.D. Ga. 1994) (similar); *Mid Valley Bank v. N. Valley Bank*, 764 F. Supp. 1377, 1384 (E.D. Cal. 1991) (similar); *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 266 (3d Cir. 1992) (similar); *United States v. W. Processing Co.*, 761 F. Supp. 713, 722 (W.D. Wash. 1991) (similar).

In the 30 years that OPA and CERCLA have co-existed, the expert agencies charged with administering those statutes have consistently addressed mixtures of oil and hazardous substances under CERCLA, while responding to pure "oil" spills under OPA. That practice is codified in a regulation issued by the National Oceanic and Atmospheric Administration ("NOAA")—the agency tasked under OPA with "promulgat[ing] regulations for the assessment of natural resource damages"—after full notice-and-comment procedures. 33 U.S.C. § 2706(e)(1). Those regulations expressly distinguish between "oil discharges covered by OPA" and "natural resource damages resulting from a discharge or release of a *mixture* of oil and hazardous substances, [for which] trustees must use [the CERCLA regulations contained in] 43 CFR part 11." 15 C.F.R. § 990.20(a)–(c) (emphasis added); 43 C.F.R. § 11.10. That reasonable interpretation of the relevant statutes is entitled to *Chevron* deference to the extent any relevant ambiguity exists in CERCLA's and OPA's statutory language. *See Buffalo Marine Servs. Inc. v. United States*, 663 F.3d 750, 754 (5th Cir. 2011) (according *Chevron* deference to USCG's interpretation of OPA); *United States v. Mead Corp.*, 533 U.S. 218, 229–31 (2001) (explaining that notice-and-comment agency rulemaking receives *Chevron* deference). Guidance documents promulgated by other agencies who enforce OPA follow the same approach to mixed discharges and therefore are entitled to great weight as this Court addresses the scope of OPA.[18]

---

[18] *See, e.g.*, Ex. 13, *An FOSC's Guide to Environmental Response*, USCG, at 26 (July 1, 2008) ("CERCLA shall be used if there is a hazardous substance mixed with an OPA oil."); Ex. 14, *Technical Operating Procedures for Determining Removal Costs under The Oil Pollution Act of 1990*, at 3-80 (June 1999), https://www.uscg.mil/Portals/0/NPFC/docs/PDFs/urg/Ch2/NPFCTOPS.pdf ("If a discharge consists of both an OPA oil and a CERCLA substance, its clean up cannot be funded from the OSLTF."); Ex. 15, *USCG Commandant Change Notice 16000*, at 13-4 (Sept. 26, 2018), https://media.defense.gov/2018/Oct/01/2002046528/-1/-1/0/CCN_16000_2018_9_26.PDF (explaining that "[t]he Superfund should be used for . . . a mixed product incident (e.g., oil discharge and hazardous substance release)").

The soundness of the agencies' consistent interpretation is confirmed by practical realities.  CERCLA and OPA both provide for recovery by various "trustees" (federal, state, and Indian tribe representatives) of "natural resource" damages.  33 U.S.C. § 2706; 42 U.S.C. § 9651(c).  But when a spill commingles oil and CERCLA substances, segregating damages between two statutory schemes—and avoiding double recovery— becomes impossible.  Ex. 9, OSLTF Report at 6 (explaining that while responders should initially try to "separate" response costs, "[i]f the substances become so co-mingled that they cannot be separated, [CERCLA] Superfund is used to clean the spill"); *see* 33 U.S.C. § 2706(d)(3) ("There shall be no double recovery under this Act for natural resource damages . . . ."); *see infra* at 22–24 (discussing other reasons why enforcing the boundaries between CERCLA and OPA is necessary).  The Court should not endorse OPA Plaintiffs' attempt to overturn 30 years of consistent agency practice rooted in statutory text.

### 3. The mixed spill here falls under CERCLA.

When ITC's tank farm discharged a mixture of oil and multiple CERCLA-regulated substances into waterways, the EPA and USCG had to decide whether to proceed under CERCLA or OPA.  Given the unwavering authority discussed above, it should come as no surprise that the EPA and USCG ultimately found that because "the substance in the canal was oil *mixed with* hazardous substances," it was "a CERCLA product," Ex. 7, USCG Memo (emphasis added), and that the natural-resources Trustees proceeded under CERCLA regulations in conducting their damages assessment.  Ex. 3, NRDA Preassessment (explaining that the "preassessment screen . . . [was] prepared by the Trustees pursuant to 43 CFR Part 11"); Ex. 6, NRDA NOI at 1 (acknowledging that "43

CFR Part 11" is appropriate for "mixture of oil and hazardous substances"). Consequently, the EPA and USCG have now decided to conduct the incident response and remedial procedures under CERCLA, refusing to maintain an OPA compensation account and declining to designate ITC as a "responsible party" under OPA. Ex. 5, EPA POLREP at 14 ¶ 2.4; Ex. 7, USCG Memo. And in thoroughly reasoned decisions that survey the statutory text, agency guidance, and case law discussed above, the USCG's NPFC has denied OPA claims for the Incident submitted by similarly situated parties because the discharge of "a commingled mixture of oil and hazardous substances . . . does not fall under OPA." Ex. 1, MACS Claim Summary/Determination; Ex. 2, Kolmar Claim Summary/Determination.

By definition, the agencies' correct determination that the Incident involved "hazardous substance[s]" excludes it from the definition of "oil" under OPA. 33 U.S.C. § 2701(23); *supra* at 12–17. Without a discharge of "oil," there can be no OPA liability. *See Nature's Way Marine*, 904 F.3d at 420 (explaining that, under "33 U.S.C. § 2702(a)[,] . . . each 'responsible party' shall be liable for the removal costs and damages when *oil* is discharged into navigable waters") (emphasis added); *Trico Marine Operators, Inc. v. Dow Chem. Co.*, 809 F. Supp. 440, 443 n.5 (E.D. La. 1992) (OPA "has no application here because the barges were carrying benzene, not oil."). OPA Plaintiffs may not unilaterally enact an unprecedented expansion of OPA liability to cover all economic losses stemming from mixed discharges. Whatever broad, remedial "purpose" OPA may have enshrined for cases that fall within its purview, the Court must give effect to "the congressional language" that circumscribes its statutory reach. *Nguyen v. Am. Commercial Lines L.L.C.*,

805 F.3d 134, 144 (5th Cir. 2015) (per curiam).  Because the OPA Actions fall outside that

scope, summary judgment is proper.

**B.  Alternatively, the USCG's decision not to designate ITC as the responsible party under OPA bars OPA Plaintiffs' claims.**

The USCG's decision not to designate ITC as an OPA "responsible party" provides

an independent ground for summary judgment.  Designation by the USCG is a statutory

condition precedent to OPA Plaintiffs' proceeding with their OPA monetary damages

claims against ITC.  If OPA Plaintiffs wish to challenge the USCG's non-designation, they

must sue under the Administrative Procedure Act ("APA"); they cannot collaterally attack

that agency decision in this lawsuit.  Thus, even if the Court were inclined to disagree that

CERCLA exclusively governs the Incident, Plaintiffs' failure to satisfy an OPA condition

precedent requires dismissal.

1.  "OPA establishes specific procedures which claimants must follow."

*Nguyen*, 805 F.3d at 138.  As relevant here, OPA dictates that the USCG play a vital

gatekeeping role in opening the door for third-party damages claims against responsible

parties.  That role is best understood in the context of OPA's three-part framework for

responsible-party designation, claim presentment, and cost recovery.

***Designation and Advertisement.***  Under OPA, "[w]hen the [USCG] receives

information of an incident, the [USCG] shall, where possible and appropriate, designate

the source or sources of the discharge or threat" and, "[i]f a designated source is a vessel

or facility, . . . shall immediately notify the responsible party . . . , if known, of that

designation."  33 U.S.C. § 2714(a); 33 C.F.R. § 136.305 (same). An "incident" is an

"occurrence . . . involving one or more . . . facilities . . . resulting in the discharge or substantial threat of discharge of oil." 33 U.S.C. § 2701(14). And, with a few exceptions not relevant here, the definition of "responsible party" broadly includes "[i]n the case of an onshore facility (other than a pipeline), any person owning or operating the facility" from which the discharge occurred. *Id.* § 2701(32)(B).

Upon the USCG's designation, the responsible party must either (1) deny the designation or (2) "advertise the designation and the procedures by which claims may be presented." *Id.* § 2714(b). If the responsible party denies designation or the USCG "is unable to designate the source or sources of the discharge," then the USCG "shall advertise or otherwise notify potential claimants of the procedures by which claims may be presented to the [OSLTF]." *Id.* § 2714(c).

**Presentment.**  Generally speaking, "all claims for removal costs or damages shall be presented first to the responsible party or guarantor of the source *designated under section 2714(a)* of" OPA. *Id.* § 2713(a) (emphasis added); *see also* 33 C.F.R. § 136.03(a) (same). That presentment procedure is "a mandatory condition precedent barring all OPA claims unless and until a claimant has presented her claims in compliance with § 2713(a)." *Nguyen*, 805 F.3d at 139. In limited circumstances not relevant here, including when the USCG "has advertised or otherwise notified claimants in accordance with section 2714(c)," a claimant can first present its claim to the OSLTF. 33 U.S.C. § 2713(b)(1).

**Filing a Claim.**  Once the claimant has presented its claim under Section 2713(a) to the "responsible party . . . designated" by the USCG and that party has denied the claim, the claimant can then "elect to commence an action in court against the responsible party

. . . or to present the claim to the Fund." *Id.* §§ 2713(a), (c).

2. Plaintiffs assert that they have followed this path, first presenting their claims to ITC as the alleged responsible party and then commencing the OPA Actions once ITC denied those claims.[19]   The problem is that Plaintiffs ignore the textual requirement that presentment be made on the "responsible party . . . *designated* under Section 2714(a)."  33 U.S.C. § 2713(a) (emphasis added).   And, of course, it is undisputed that the USCG declined to make such an OPA designation here with respect to ITC.  *See* Ex. 1, MACS Claim Summary/Determination at 4 ("ITC was not designated a responsible party under OPA"); Ex. 2, Kolmar Claim Summary/Determination at 4 (same); Ex. 7, USCG Memo (concluding that "this was a CERCLA incident").  OPA Plaintiffs cannot be permitted to short-circuit the carefully calibrated procedural scheme enacted by Congress for OPA claims.

"[O]ne of the most basic interpretative canons [is] that '[a] statute should be construed so that effect is given to all its provisions so that no part will be inoperative or superfluous . . . .'"  *Corley v. United States*, 556 U.S. 303, 314 (2009) (second alteration in original) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).   OPA Plaintiffs cannot wish away the requirement that the alleged responsible party first be "designated" as such by the USCG.   What is more, the inclusion of this limiting language was manifestly intentional. "[W]hen the legislature uses certain language in one part of the statute and different

---

[19] *E.g.*, Compl. ¶¶ 52, 56 (alleging that ITC is the "Responsible Party" and that "Texas Aromatics has satisfied all conditions precedent to commencement of this action under OPA, including without limitation by . . . timely presenting its claim to ITC").

language in another, the court assumes different meanings were intended." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (internal quotation marks omitted).  OPA refers elsewhere to "responsible parties" *without* requiring that those parties be formally "designated."  *See, e.g.*, 33 U.S.C. § 2712(f) (providing right of "subrogation" by "the United States Government . . . to recover from the responsible party" for "[p]ayment of any claim or obligation by the [OSLTF]").  But Congress made a different choice when drafting the presentment requirement.

The Fifth Circuit has recognized as much in considered dicta.  In *In re Settoon Towing, L.L.C.*, for example, the Fifth Circuit described the "clear requirement of the OPA" that "[f]irst, the injured party must present its claim for damages to the *designated* Responsible Party."  859 F.3d 340, 345 (5th Cir. 2017) (emphasis added).  And in *Nguyen*, while discussing another case, the Fifth Circuit referred to the "Coast Guard . . . not identify[ing] the responsible party" as the sort of "circumstance[] that [would have] precluded [claimants] from presenting their claims."[20]  Nor is the Fifth Circuit alone in acknowledging that formal designation of a responsible party is the necessary condition precedent for a private party's presentment of claims to the designee and ultimate commencement of suit.  *See, e.g.*, *Uncharted Waters*, *supra* at 2 (OPA Plaintiffs' counsel explaining that "[it] seems a foregone conclusion that ITC will be designated as a Responsible Party" and that "parties *must first submit their damages claim* to the

---

[20] 805 F.3d at 143–44 (discussing *Denehy v. Mass. Port Auth.*, 42 F. Supp. 3d 301, 308 (D. Mass. 2014) (involving the USCG's failure to designate a responsible party until "55 days before the end of the three-year window to file the" OPA lawsuit, which made it impossible for the plaintiff to "me[e]t both the [90-day] presentment requirement and the statute of limitations")).

Responsible Party (as *identified by the U.S. Coast Guard*)") (emphases added).

3.       The USCG's gatekeeping responsibility for private-party claims makes practical sense in the broader context of OPA's funding scheme.  *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (explaining that "words of a statute must be read in . . . context and with a view to their place in the overall statutory scheme") (internal quotation marks omitted).  OPA relies on two sources to fund third-party claims: the OSLTF and the responsible parties themselves.  *Supra* at 10.  By respecting the USCG's exclusive authority to designate responsible parties whenever doing so is "possible and appropriate," 33 U.S.C. § 2714(a), the Court will preserve the agency's ability to channel third-party claimants to the proper funding source, thus ensuring that the "statute [remains] a symmetrical and coherent regulatory scheme."  *Brown & Williamson*, 529 U.S. at 133 (internal quotation marks omitted).

Consider first the situations in which the USCG does not designate a responsible party because it identified an OPA discharge but (1) "determined that there was no potential for claims" (*i.e.*, it was not "appropriate" to designate), *Smith Prop. Holdings, 4411 Connecticut L.L.C. v. United States*, 311 F. Supp. 2d 69, 83 (D.D.C. 2004), or (2) was otherwise "unable to designate the source or sources of the discharge or threat" (*i.e.*, not "possible" to designate), 33 U.S.C. § 2714(c)(3).  In the former situation, the need for private-party claim presentment does not arise.  And in the latter situation, the USCG will "advertise or otherwise notify potential claimants," who can then seek recovery *directly* against the OSLTF itself.  33 U.S.C. §§ 2713(b)(1), 2714(c).  Permitting third parties to jump the gun and proceed against any number of undesignated, allegedly responsible

parties would create discord in the USCG's orderly administration of the OSLTF and cost-recovery actions.

The situation here—in which the USCG (in conjunction with the EPA) determined that CERCLA controls and that OPA has *no application*—presents an even starker need for enforcing the formal-designation requirement.  As discussed earlier, *supra* at 11, CERCLA and OPA rely on separate funding mechanisms and thus operate as mutually exclusive, "comprehensive" liability schemes.[21]

Each statute operates as a self-contained, cost-shifting system involving some combination of (1) third parties recovering against the relevant fund or responsible parties; (2) the fund paying claims or recouping costs from responsible parties; and/or (3) those responsible parties seeking contribution from one another or, to the extent they have a valid defense or incur removal costs above CERCLA's or OPA's distinct limitations of liability, recouping costs from the relevant fund.  *Supra* at 8–12.  Thus, where the USCG has determined that CERCLA applies to an incident and correspondingly declines to designate a "responsible party" under OPA, permitting claimants to unilaterally proceed under OPA would give rise to the untenable scenario in which *both* OPA and CERCLA funds become implicated for the same response costs or damages.[22]  By conferring gatekeeping authority to designate responsible parties upon the USCG, OPA was designed to avoid precisely that

---

[21] *See ARC Ecology v. U.S. Dep't of Air Force*, 411 F.3d 1092, 1094 (9th Cir. 2005) ("As its name suggests, CERCLA is a comprehensive statute . . . .") (internal quotation marks omitted); *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mex., on April 20, 2010*, 808 F. Supp. 2d 943, 959 (E.D. La. 2011) (explaining that "OPA is a comprehensive statute"), *aff'd sub nom. In re DEEPWATER HORIZON,* 745 F.3d 157 (5th Cir. 2014).

[22] *See* 33 U.S.C. § 2712(i) (explaining that "no other claim may be paid from the Fund for the same removal costs or damages"); Ex. 9, OSLTF Report at 6 (explaining that "[i]f the substances become so co-mingled that they cannot be separated, [CERCLA] Superfund is used to clean the spill").

result.

4.    OPA Plaintiffs may not evade the requirement for *USCG* designation by asking *this Court* to declare ITC a responsible party in an OPA damages lawsuit against ITC.  *See* Compl. ¶ 71 (seeking "[a] declaration that ITC is a Responsible Party under OPA).  Instead, OPA Plaintiffs must seek that designation under the APA.[23]   By seeking a responsible-party designation from this Court, OPA Plaintiffs have improperly instituted "a collateral proceeding [that would] end-run the procedural requirements governing appeals of administrative decisions."[24]

Because OPA Plaintiffs have not presented their claims to a responsible party designated by the USCG, the OPA Actions cannot proceed.

## V.    CONCLUSION & PRAYER

For the foregoing reasons, the Court should grant ITC's motion for summary judgment and dismiss all of Plaintiffs' claims.  ITC prays for such other and further relief to which it may be justly entitled.

---

[23] *See* 5 U.S.C. §§ 702-03, 706(1), 706(2)(A) (creating a cause of action against the United States to "compel agency action unlawfully withheld" or "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"); *see, e.g.*, *Smith*, 311 F. Supp. 2d at 79-80, 83 (rejecting APA challenge because USCG's responsible-party determination was not "arbitrary or capricious, or contrary to law"); *Nature's Way Marine*, 904 F.3d at 418 (resolving APA challenge to USCG's determination that party was an "operator" and thus an OPA responsible party).

[24] *United States v. Backlund*, 689 F.3d 986, 1000 (9th Cir. 2012); *see also Big Lagoon Rancheria v. California*, 789 F.3d 947, 953 (9th Cir. 2015) (explaining that "[t]he proper vehicle to make such a challenge is a petition for review pursuant to the APA"); *Alazan-Apache Resident Ass'n v. San Antonio Hous. Auth.*, 885 F. Supp. 949, 957 (W.D. Tex. 1995) (granting summary judgment when "Plaintiffs [we]re essentially seeking judicial review of [agency] action" and failed to make the requisite "challenge . . . under the Administrative Procedure Act").

Dated:  September 4, 2020

OF COUNSEL:
Michael S. Goldberg
Texas Bar No. 08075800
Federal I.D. No. 01279
Benjamin Gonsoulin
Texas Bar No. 24099682
Federal I.D. No. 2969896
Kelly Hanen
Texas Bar No. 24101862
Federal I.D. No. 3038458
Elizabeth Furlow
Texas Bar No. 24109899
Federal I.D. No. 3402815
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002-4995
Telephone:  (713) 229-1234
Facsimile:  (713) 229-1522
michael.goldberg@bakerbotts.com
ben.gonsoulin@bakerbotts.com
kelly.hanen@bakerbotts.com
elizabeth.furlow@bakerbotts.com


Ivan M. Rodriguez
Texas Bar No. 24058977
Federal I.D. No. 4566982
Marc G. Matthews
Texas Bar No. 24055921
Federal I.D. No. 705809
PHELPS DUNBAR LLP
500 Dallas, Suite 1300
Houston, Texas  77002
Telephone:  (713) 626-1386
Telecopier:  (713) 626-1388
ivan.rodriguez@phelps.com
marc.matthews@phelps.com

Respectfully submitted,

BAKER BOTTS L.L.P.

By:_____
     Russell C. Lewis
     Attorney-in-Charge
     Texas Bar No. 24036968
     Federal I.D. No. 569523
     One Shell Plaza
     910 Louisiana Street
     Houston, Texas 77002-4995
     Telephone:  (713) 229-1767
     Facsimile:  (713) 229-2867
     russell.lewis@bakerbotts.com


ATTORNEYS FOR DEFENDANT
INTERCONTINENTAL TERMINALS
COMPANY LLC

52374997

26

CERTIFICATE OF SERVICE

I certify that on September 4, 2020, a copy of this document has been served on all counsel of record in the above-captioned cases by electronic mail.

_Russell C. Lewis_