United States District Court
Southern District of Texas
**ENTERED**
October 02, 2023
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| MINTON *et. al.* | § | No. 4:21-cv-00143 |
| *Plaintiffs,* | § | |
| v. | § | |
| | § | |
| INTERCONTINENTAL | § | |
| TERMINALS COMPANY, LLC *et.* | § | |
| *al.* | § | |
| *Defendants.* | § | |
| _____ | § | |
| | § | |
| *IN RE*: INTERCONTINENTAL | § | No. 4:19-cv-1460 |
| TERMINALS COMPANY, LLC | § | |
| DEER PARK FIRE LITIGATION | § | |

**MEMORANDUM AND ORDER**

Pending before the Court is Defendant Intercontinental Terminals Company, LLC's ("ITC") Motion to Exclude Expert Testimony Concerning Inapplicable OSHA Regulations. ECF No. 276; *see also In re Intercontinental Terminals Company LLC Deer Park Fire Litigation*, 4:19-cv-01460 ("*Munoz*"), Mot. Exclude, ECF Nos. 1474.[1] The issue before the Court is whether certain opinions of Plaintiffs' expert, Russ Elveston, concerning "the application of, and ITC's alleged violations of, 29 C.F.R. § 1910.119," OSHA's Process Safety Management ("PSM") regulation

---

[1] On September 29, 2022, based on the parties' consent, this bellwether consolidated case was deconsolidated from the *Munoz* consolidated case and transferred to this Court to conduct all proceedings pursuant to 28 U.S.C. § 636(c). Order Transferring, ECF No. 12; *see also Munoz*, 4:19-cv-1460, Order Transferring, ECF No. 1332. This order is filed in both cases so that the remaining plaintiffs are aware of the actions in this bellwether consolidated case.

should be excluded pursuant to Federal Rule of Civil Procedure 702. ECF No. 276 at 5; *Munoz,* 4:19-cv-1460, ECF No. 1474 at 5. After thoroughly considering the pleadings,[2] expert reports, and the applicable law, the Court concludes that Mr. Elveston's proposed expert testimony addressing ITC's purported violations of § 1910.119 must be excluded because that OSHA regulation is inapplicable to Tank 80-8's operations and does not establish the appropriate standard of care, which is a question of law for the Court to decide. Therefore, pursuant to Rule 702, Mr. Elveston's testimony would not be helpful to the jury.[3]

## I.      BACKGROUND.

### A.      The Underlying Litigation.

This action involves a fire at ITC's Deer Park, Texas facility that burned from March 17, 2019 to March 20, 2019. Most of the Plaintiffs in the consolidated action are residents of the surrounding community who have sued for personal injuries they claim to have suffered arising from their exposure to the toxic chemicals released into the atmosphere from the fire ("PI Plaintiffs"). The remaining Plaintiffs are various businesses who have sued for financial damages they claim to have suffered

---

[2] Defendant NSK Ltd. ("NSK") filed a response, ECF Nos. 288, 289; *Munoz,* 4:19-cv-1460, ECF Nos. 1501, 1503, and Plaintiffs filed a response, wherein they joined NSK's response and raised an additional argument, ECF Nos. 290, 291; *Munoz,* 4:19-cv-1460, ECF Nos. 1502, 1504. ITC filed a reply, ECF No. 304; *Munoz,* 4:19-cv-1460, ECF No. 1522.

[3] ITC also sought to strike the testimony of NSK's OSHA expert, Dr. Andrew Wolford. ECF No. 276 at 2; *Munoz,* 4:19-cv-1460, ECF No. 1474 at 2. Because Plaintiffs have dismissed their claims against NSK, and no party plans to call him as a witness, this motion as to NSK's expert is moot. *See* ECF No. 304 at 19–20; *Munoz,* 4:19-cv-1460, ECF No. 1522 at 19–20.

because of the fire's impact on the surrounding area, including the waterways ("Commercial Plaintiffs").

On March 16, 2019, two truckloads of butane were injected into Tank 80-8. ECF Nos. 277-4 at 2–7, 277-8 at 2–9; *Munoz,* 4:19-cv-1460, ECF Nos. 1475-4 at 2–7; 1475-8 at 2–9. Plaintiffs allege that Tank 80-8's circulation pump ran from March 16, 2019 into the following day. On the morning of March 17, 2019, the liquid level in Tank 80-8 rapidly decreased without setting off any alarm; approximately thirty minutes later, the fire ignited. ECF Nos. 277-4 at 2–7, 277-8 at 2–9; *Munoz,* 4:19-cv-1460, ECF No. 1503 at 8. Fifteen storage tanks containing chemicals burned. Following the fire, ITC investigated the root cause. Buehler Dep. 123:3–4, ECF No. 56-10; *Munoz,* 4:19-cv-1460, ECF No. 1381-10. According to ITC's Root Cause Analysis Report, the loss of primary containment leading to the fire occurred within the manifold power frame of Tank 80-8—an atmospheric tank that stored naphtha enriched with butane. Root Cause Analysis Rept. at ix, ECF No. 56-9; *Munoz,* 4:19-cv-1460, ECF No. 1381-9.

Approximately three months before the fire, a new NSK Model 5313 bearing was installed in Tank 80-8's pump. ECF No. 56-9; *Munoz,* 4:19-cv-1460, ECF No. 1381-9. A post-fire metallurgical analysis of the NSK Model 5313 bearing indicated that the bearing's individual balls had internal voids. ECF No. 56-9; *Munoz,* 4:19-cv-1460, ECF No. 1381-9. The Root Cause Analysis Report concluded

3

that the internal voids compromised the bearing's structural integrity. ECF No. 56-9;
*Munoz,* 4:19-cv-1460, ECF No. 1381-9. As a result, the structure experienced
vibrations that caused the mechanical seal gland to dislodge and allow naphtha to
escape from its sealed chamber. ECF No. 56-9; *Munoz,* 4:19-cv-1460, ECF
No. 1381-9. The leaking naphtha's vapor ignited and started the fire. ECF No. 56-9;
*Munoz,* 4:19-cv-1460, ECF No. 1381-9.

The PI Plaintiffs bring claims for injuries allegedly suffered because of the
fire, including negligence and gross negligence claims against ITC. *See* ECF No. 85;
*Munoz,* 4:19-cv-1460, ECF No. 544. On September 18, 2023, all Plaintiffs
voluntarily dismissed their claims against NSK. ECF Nos. 311, 313; *Munoz,* 4:19-
cv-1460, ECF No. 1532. The first of the bellwether personal injury cases is set for
trial on November 6, 2023. ITC filed this *Daubert* motion in advance of trial.

### B.  Russ Elveston's Report.

Russ Elveston is Plaintiffs' OSHA expert. Elveston's Report, ECF No. 290-2
at 2; *Munoz,* 4:19-cv-1460, ECF No. 1502-2 at 2. Mr. Elveston is "a licensed
Professional Engineer and former OSHA Safety Engineer and Compliance Safety
and Health Officer (CSHO) with over 45 years of experience." ECF No. 290-2 at 2;
*Munoz,* 4:19-cv-1460, ECF No. 1502-2 at 2. Relevant herein, Mr. Elveston offers
the following opinion:

> it is my expert opinion that the OSHA PSM applied to Tank 80-8 and
> its butane blending operations. Further, even if this Court decided that

ITC was not technically legally bound to comply with OSHA PSM in relation to Tank 80-8, ITC's conduct in not having a robust PSM program falls beneath the standard of care in the industry and represented a deliberate decision to refrain from implementing containment measures it had already found to be necessary in the 2014 MOC and HAZOP. Whether or not ITC's position regarding the scope of the atmospheric tank exemption is legally correct, nothing prevented ITC from implementing a PSM program in accordance with the standard of care in the industry, and its apparent decision not to do so simply because it believed the atmospheric tank exemption did not require such a program was tantamount to placing its corporate head in the sand. ITC's failure to adopt a comprehensive and robust PSM created an unacceptable and extreme degree of risk of a catastrophic outcome, given the recognized hazards relating to loss of containment fire and explosion, of which ITC was subjectively aware at the time of the 2014 MOC and HAZOP for the addition of the butane injection line.

ECF No. 290-2 at 5; *Munoz,* 4:19-cv-1460, ECF No. 1502-2 at 5.[4]

## II.   STANDARD FOR EXPERT TESTIMONY.

Federal Rule of Evidence 702 governs the admissibility of expert testimony and reports. It provides that expert testimony will be allowed if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and

---

[4] ITC argues in their reply that Elveston's Affidavit is untimely as it was produced after the discovery deadline and the deadline enumerated in Federal Rule of Civil Procedure 26(a)(2)(D), which states that parties must disclose expert testimony at least 90 days before the date set for trial. ECF No. 304 at 20; *Munoz,* 4:19-cv-1460, ECF No. 1522 at 20. The affidavit, dated August 18, 2023, is indeed untimely because the expert discovery deadline was May 23, 2023, and, 90 days before trial was August 8, 2023. ECF No. 222; *Munoz,* 4:19-cv-01460, ECF No. 1282. Even so, the Court considers ITC's substantive arguments herein, and ultimately finds that Mr. Elveston may not testify as to whether § 1910.119's requirements apply to ITC's Tank 80-8.

methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702.

District courts act as the gatekeeper in making determinations as to the admissibility of expert testimony. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). As a preliminary matter, a district court must determine whether the proffered witness qualifies as an expert "by virtue of his knowledge, skill, experience, training, or education." *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) (quotation omitted). If the expert is qualified, the "overarching concern" becomes "whether the testimony is relevant and reliable." *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 293 (5th Cir. 2019). ITC does not contest either expert's qualifications.

To be reliable, expert testimony must "be grounded in the methods and procedures of science and be more than unsupported speculation or subjective belief." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (cleaned up). To be relevant, the expert's "reasoning or methodology [must] be properly applied to the facts in issue." *Id*. (quotation omitted).

"As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility." *Puga*, 922 F.3d at 294. A district court's role under Rule 702 "is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role—the court's

role is limited to ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue so that it is appropriate for the jury's consideration." *Id*. As the United States Supreme Court explained: "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. "While the district court must act as a gatekeeper to exclude all irrelevant and unreliable expert testimony, 'the rejection of expert testimony is the exception rather than the rule.'" *Puga*, 922 F.3d at 294 (quoting FED. R. EVID. 702 advisory committee's note to 2000 amendment).

## III.   ELVESTON'S EXPERT OPINIONS REGARDING § 1910.119 IS EXCLUDED.

ITC contends that "Plaintiffs [] intend to introduce OSHA's PSM through their experts at trial and to argue that ITC failed to meet its standard of care by allegedly not complying with the PSM." ECF No. 276 at 12; *Munoz,* 4:19-cv-1460, ECF No. 1474 at 12. ITC argues that the expert opinions regarding the PSM should be excluded because: (1) §1910.119 is inapplicable to ITC's operations at Tank 80-8 and its butane injection system and therefore irrelevant to determining whether ITC violated its standard of care; and (2) because §1910.119 is inapplicable to ITC's operations, any introduction of opinion testimony related to ITC's failure to comply with § 1910.119 will only confuse the jury, thereby violating Rule 403. ECF No. 276 at 12; *Munoz,* 4:19-cv-1460, ECF No. 1474 at 12.

The Court finds that because § 1910.119 by its own terms is inapplicable to Tank 80-8's operations and ITC did not voluntarily adopt § 1910.119's requirements, Mr. Elveston should not be permitted to testify as to whether ITC's operations at Tank 80-8 violated § 1910.119 as such testimony would not be relevant.

### A.      Section 1910.119 is inapplicable to Tank 80-8's operations.

ITC contends that because "[§ 1910.119] does not apply to ITC's storage of naphtha in Tank 80-8 or the butane injection process," testimony regarding OSHA's PSM and ITC's alleged non-compliance is irrelevant and therefore not helpful testimony under Rule 702. ECF No. 276 at 12; *Munoz,* 4:19-cv-1460, ECF No. 1474 at 12. ITC argues that § 1910.119 is inapplicable because Tank 80-8 satisfies the provision's exemption for "flammable liquids with a flashpoint below 100°F (37.8°C) stored in atmospheric tanks or transferred which are kept below their normal boiling point without benefit of chilling or refrigeration"—Tank 80-8 is an atmospheric tank with no chilling or refrigeration which stored naphtha enriched with butane, both flammable liquids with flashpoints well below 100°F, and was only used for the storage and transfer of naphtha and butane. ECF No. 276 at 12–13; *Munoz,* 4:19-cv-1460, ECF No. 1474 at 12–13.

In response, Plaintiffs contend that this dispute boils down to a mere disagreement between expert opinions that the jury should be allowed to decide.

ECF No. 290 at 9; *Munoz,* 4:19-cv-1460, ECF No. 1502 at 9. Quite to the contrary, this is a legal question concerning the relevant standard of care, which is a question for the Court, not the jury, to decide. *See Nationwide Prop. & Cas. Ins. Co. v. Gen. Motors, LLC*, 98 F. Supp. 3d 901, 904 (S.D. Tex. 2015) ("Whether a duty exists is a question of law for the court to decide under the facts surrounding the occurrence in question.") (quoting *Lefmark Mgmt. Co. v. Old,* 946 S.W.2d 52, 53 (Tex. 1997) (citing *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex. 1995))). The Court will not allow an expert to give an opinion on an irrelevant standard of care. *See Matter of M&M Wireline & Offshore Services, LLC*, No. 15-5338, 2017 WL 480603, at *7 (E.D. La. Feb. 3, 2017).

To show that the exception did not apply and Tank 80-8 fell within the regulation, Plaintiffs contend that "the manner in which ITC chose to implement the butane blending was a 'process' as that term is defined under the statute, and therefore, the atmospheric tank exemption did not apply to save ITC's conduct from being unlawful and in noncompliance with the regulations." ECF No. 290 at 8; *Munoz,* 4:19-cv-1460, ECF No. 1502 at 8. Specifically, Plaintiffs argue that because the exemption only applies to transfer and storage of the chemical, ITC's "mixing with the use of the pump and associated piping resulted in the operation becoming a PSM 'process' under the regulation." ECF No. 290 at 9; *Munoz,* 4:19-cv-1460, ECF No. 1502 at 9. Plaintiffs contend that this is evident because OSHA initially cited

ITC following the fire for failing to have a written Mechanical Integrity Program

pursuant to § 1910.119. ECF No. 290 at 9–10; *Munoz,* 4:19-cv-1460, ECF No. 1502

at 9–10.[5]

Title 29, section 1910.119 of the C.F.R., entitled "Process safety management

of highly hazardous chemicals," "contains requirements for preventing or

minimizing the consequences of catastrophic releases of toxic, reactive, flammable,

or explosive chemicals," which "may result in toxic, fire or explosion hazards." 29

C.F.R. § 1910.119. Section 1910.119(a)(1)(ii)(B) states that:

> [t]his sections applies to . . . [a] process which involves . . . a flammable
> liquid with a flashpoint below 100 °F (37.8 °C) on site in one location,
> in a quantity of 10,000 pounds (4535.9 kg) or more *except for
> [f]lammable liquids with a flashpoint below 100 °F (37.8 °C) stored in
> atmospheric tanks or transferred which are kept below their normal
> boiling point without benefit of chilling or refrigeration.*

29 C.F.R. § 1910.119(a)(1)(ii)(B) (emphasis added). "Process" is defined as "any

activity involving a highly hazardous chemical including any use, storage,

manufacturing, handling, or the on-site movement of such chemicals, or

combination of these activities. . . . " 29 C.F.R. § 1910.119(b).

Tank 80-8 is an atmospheric storage tank that stored naphtha and butane. ECF

Nos. 276-7 at 3; 277-3 at 3; 277-4 at 2, 7; 277-8 at 2, 9; *Munoz,* 4:19-cv-1460, ECF

---

[5] Before dismissal, NSK did not join in this argument, and instead asserted that § 1910.119 does
not apply by its own terms. *See* ECF No. 288 at 16; *Munoz,* 1501 at 16 ("Just as here, the company
was not bound by OSHA regulations as a matter of statute.").

Nos. 1474-7 at 3; 1475-3 at 3; 1475-4 at 2, 7; 1475-8 at 2, 9. Naphtha is a flammable liquid with a flashpoint of -7°F. ECF Nos. 276-7 at 3; 277-6 at 6; *Munoz,* 19-cv-1460, ECF Nos. 1474-7 at 3; 1475-6 at 6. Butane is a flammable liquid with a flashpoint of -76°F. ECF Nos. 276-7 at 3; *Munoz,* 19-cv-1460, ECF No. 1474-7 at 3. Tank 80-8 did not utilize chilling or refrigeration to keep the naphtha or butane under their respective boiling points. ECF Nos. 276-7 at 3; *Munoz,* 19-cv-1460, ECF No. 1474-7 at 3.

Tank 80-8 had an injection system that enriched the naphtha in the tank with butane. ECF Nos. 276-8 at 2; 277-4 at 2; 277-5 at 2; 277-7 at 2; *Munoz,* 19-cv-1460, ECF Nos. 1474-8 at 2, 1475-4 at 2; 1475-5 at 2; 1475-7 at 2. The enrichment process is roughly outlined as follows: a cargo tank motor vehicle ("CTMV") unloaded butane into the atmospheric tank containing the naphtha via the butane injection system, ECF No. 277-4 at 2; 277-9 at 2; *Munoz,* 4:19-cv-1460, ECF No. 1475-4 at 2; 1475-9 at 2, and following delivery, the pump remained on until all unloading activity finished for the day, and/or for an additional four hours after the last truck of the day, ECF Nos. 277-7 at 9; 277-9 at 4; *Munoz,* 4:19-cv-1460, ECF Nos. 1475-7 at 9; 1475-9 at 4. After completion of the requisite circulation, an employee closed Tank 80-8's valves and shut down its pumps, and at this time, a tank sample was inspected. ECF Nos. 277-7 at 9; 277-9 at 4; *Munoz,* 4:19-cv-1460, ECF Nos. 1475-

7 at 9; 1475-9 at 4.[6]

The Parties do not disagree about the facts—rather, they disagree as to whether the continued mixing following the departure of the CTMV constituted a separate "process" from transfer or storage, thereby bringing Tank 80-8's operations within the purview of § 1910.119's requirements. ECF Nos. 276-12 at 4–5, 6; *Munoz,* 19-cv-1460, ECF Nos. 1474-12 at 4–5, 6. Based on OSHA guidance, the Court finds that the departure of the CTMV does not remove Tank 80-8's operations from § 1910.119's atmospheric tank exception.[7]

OSHA's May 17, 1995 Standard Interpretation is enlightening on this matter.[8] In this Standard Interpretation, the following scenario was presented to OSHA:

> Terminal operators store gasoline in atmospheric tanks. Subsequently, this gasoline is sold over the rack to companies which sell at service stations to the general public. During the year, gasoline is shipped to

---

[6] Nothing before the Court indicates that the pump was utilized for any other purpose than the above-described butane delivery process.

[7] Interestingly, by and through their Joinder of NSK's response, Plaintiffs reference, and even attach to their response, an inadmissible Chemical Safety Board report as support for their argument that § 1910.119 supplies the relevant standard of care in this case. *See* ECF Nos. 288-2; 289 at 17, 20; 290 at 4; *Munoz,* 4:19-cv-1460, ECF Nos. 1501-2; 1502 at 4; 1503 at 17, 20. But, the CSB report clearly holds that the atmospheric tank exemption in § 1910.119 applies to Tank 80-8's operations. See ECF No. 288-2 at 10 ("the CSB determined that because of the atmospheric storage tank exemption contained in the OSHA PSM standard and the flammability exemption contained in the EPA RMP rule, ITC was not required to develop and implement a formal PSM program for Tank 80-8 and its associated equipment . . . . "); *Munoz,* 4:19-cv-1460 at 10. Because the CSB report is inadmissible, the Court did not rely upon its findings in reaching the conclusions herein, but notes that the report supports the Court's conclusion and not those proffered by Plaintiffs.

[8] *See* OSHA Standard Interpretation of May 17, 1995, entitled: *Confirmation that mixing of liquefied butane, transferred by a CTMV, with gasoline stored in atmospheric tanks at terminals is not covered by the PSM Standard,* 1995 WL 172122014, https://www.osha.gov/laws-regs/standard interpretations/1995-05-17 (last visited August 25, 2023).

the terminals by pipeline, barge, truck or rail tank car at a lower Reid vapor pressure than the maximum allowed by the state or the Environmental Protection Agency (EPA), for the geographical location of the terminal. The terminal personnel test the Reid vapor pressure of the gasoline by using an instrument approved by the EPA. If the Reid vapor pressure of the gasoline is lower than the maximum allowed at the time, the terminal operator will order normal, that is, liquefied, butane delivered by CTMV(s) to raise the Reid vapor pressure of the gasoline stored in the atmospheric tanks. The normal butane is delivered to the terminal in a Department of Transportation (DOT) approved CTMV. Typically, the gasoline is pumped from an atmospheric storage tank through a pipeline where the liquefied butane is mixed with the gasoline and returned to the atmospheric storage tank. When unloaded and disconnected, the CTMV leaves the terminal operator's property. The gasoline is then retested to assure that the Reid vapor pressure is not higher than EPA regulations allow. Effective January 1, 1995, terminal operators who wish to continue normal butane blending at their terminals are required by EPA, pursuant to the Clean Air Act, to register as a refinery.

1995 WL 17212204, at *1. OSHA responded that the above scenario is not subject to § 1910.119's requirements because it is exempted under the atmospheric tank exemption. OSHA stated that this operation fits into the exemption because "[i]n addition to the . . . delivery activity, the process only involves atmospheric tanks storage and associated transfer." *Id.* Nothing within the above guidance delineates that the exempted mixing must take place while a CTMV is at the tank, as Plaintiffs suggest.[9] *See id.*

The operations at Tank 80-8 are substantially similar to the scenario presented

---

[9] In fact, the CTMV appears to only be relevant to OSHA's analysis insofar as it is deemed an appropriate way to deliver butane.

above. Here, butane is delivered via the injection system and the butane and naphtha are mixed via a pump for the requisite amount of time to complete the transfer—when the pump is shut down, a tank sample is collected. ECF Nos. 277-7 at 10; 277-9 at 4; *Munoz,* 19-cv-1460, ECF Nos. 1475-7 at 10; 1475-9 at 4. There is no indication that the complained-of mixing is for any purpose other than transferring or storing the naphtha and butane in Tank 80-8. Based on OSHA's guidance and reasoning, the Court is unpersuaded by Plaintiffs' view of § 1910.119's exemption.

Notably, there appears to only be one opinion—state or federal, published or unpublished—that discusses the applicability of § 1910.119(a)(1)(ii)(B), and it supports the Court's conclusion in this matter. In *Ever Cat Fuels, LLC v. Peterson*, No. A15-1365, 2016 WL 2946068, at *1 (Minn. Ct. App. May 23, 2016), the court upheld an ALJ's determination that the atmospheric tank exemption did not apply to T-407's operations. Id. at *4. The court summarized the plaintiff's production of biodiesel fuel as follows:

> To produce biodiesel fuel, Ever Cat uses the McGyan process, which involves the blending of liquid methanol and lipid feedstock. Liquid methanol is delivered to and stored in tank T–101, a 75,000–gallon atmospheric tank. The methanol from T–101 is transferred through a permanent pipe to tank T–407, an atmospheric tank with a capacity of 2,000 gallons. T–407 usually contains 800 to 1,000 gallons of methanol at any given time. The methanol in T–407 is continuously pumped at a rate of eight gallons per minute into a T junction located inside one of Ever Cat's production buildings. At the T junction, the methanol is mixed with lipid feedstock, which comes from a separate source. The mixture passes through filters and a heat exchanger that brings the two elements up to the desired reaction temperatures. The mixture is then

pumped through a reactor where a chemical reaction occurs that produces biodiesel fuel and waste products. Only 10% of the liquid methanol sent from T–407 is consumed in the reaction. The other 90% is a waste product in gaseous form. The gaseous methanol is distilled to liquid form and returned to T–407 for reuse in the production process. . . .

*Id.* at *1.

The court upheld the ALJ's decision because "what happens to the methanol in T-407 goes beyond being transferred to or from storage," and noted that "[m]ethanol from T–101 flows continuously into T–407 and combines with recycled liquid methanol that is constantly returning from the distillation tower. The recycled methanol *changes* the liquid methanol coming from T–101 by heating it in the course of the production process while the liquid methanol from T–101 cools the recycled liquid methanol. Further, the methanol *is in use, as opposed to being reserved for future use, when it is mixed*." *Id.* at *4 (emphasis added). Here, there is nothing about Tank 80-8's operative proceedings that "goes beyond being transferred to or from storage," and there is no indication that the mixing puts the enriched naphtha in use, as opposed to reserved for future use. *See id.* Under the atmospheric tank exemption, § 1910.119's requirements do not apply to Tank 80-8's operations.[10]

---

[10] The Court is also unconvinced that § 1910.119 applies because OSHA initially cited ITC following the fire for failing to have a written Mechanical Integrity Program pursuant to § 1910.119 and required ITC to adopt a PSM following the fire. As Plaintiffs noted, as part of ITC's settlement with OSHA, OSHA amended their citation to a violation of the general duty clause in § 5(a)(1) without mention of PSMs or § 1910.119. The Court is unaware of the circumstances surrounding this amendment in the settlement—on the current record, it is as likely

**B.      ITC did not voluntarily adopt § 1910.119's requirements.**

By and through their joinder and adoption of NSK's response, Plaintiffs argue that by virtue of ITC's membership in the American Chemistry Council's ("ACC") Responsible Care Program, ITC was required to adopt a PSM program—ITC adopted OSHA's PSM, as evidenced by ITC's Internal Management of Change policy, 2017 property insurance, and failure to indicate which PSM applied, if not OSHA's PSM.[11] ECF No. 288 at 10–14; *Munoz,* 4:19-cv-1460, ECF No. 1501 at 10–14. ITC argues that it did not voluntarily invoke the PSM by virtue of its ACC membership or its internal policies. ECF No. 276 at 16–17; *Munoz,* 19-cv-1460, ECF No. 1474 at 16–17.

In their Control Procedure on Mechanical Integrity, ITC states that the procedure's purpose "is to define the requirements for maintaining the Mechanical Integrity of the equipment utilized in the handling and storage of those chemicals regulated by OSHA 1910.119. . . . [and] set in place a management system to ensure compliance with PSM, RMP, RC14001 and any permit requirement." ECF No. 277-11 at 2; *Munoz,* 4:19-cv-1460, ECF No. 1475-11 at 2. The procedure further states that its scope encompasses the "equipment handling or storing chemicals . . .

---

that OSHA improperly cited ITC as it is that ITC negotiated the specific violation in the settlement documents.

[11] To this point, Plaintiffs contend that § 1910.119 is the industry standard and because ITC has failed to present an alternative standard of care—as there is no alternative—OSHA's PSM applies by default. ECF No. 288 at 9–10; *Munoz,* 4:19-cv-1460, ECF No. 1501 at 9–10.

identified in Regulated Chemicals Table ITC-08-A-a7." ECF No. 277-11 at 2; *Munoz,* 4:19-cv-1460, ECF No. 1475-11 at 2. Neither butane nor naphtha is listed in Regulated Chemicals Table ITC 08-A-a7. ECF No. 277-12 at 2; *Munoz,* 4:19-cv-1460, ECF No. 1475-12 at 2. Accordingly, by its plain language, this procedure necessarily excludes operations at Tank 80-8 from the adopted requirements of § 1910.119.

Plaintiffs instead urge the Court to consider ITC's Management of Change ("MOC") policy, which "appl[ies] to the evaluation and approval of any changes to the facility design, operation, organization, or activities at ITC." ECF No. 289-2 at 2; *Munoz,* 4:19-cv-1460, ECF No. 1503-2 at 2. In the MOC policy, the PSM is defined as "OSHA 1910.119" and OSHA 1910.119 is listed as an applicable regulation. ECF No. 289-2 at 2, 3; *Munoz,* 4:19-cv-1460, ECF No. 1503-2 at 2, 3. But this policy is not applicable to the daily operations, i.e., "maintaining the Mechanical Integrity of the equipment utilized in the handling and storage of [] chemicals," to which Plaintiffs wish to apply the policy. Whereas the MOC policy Plaintiffs cited only applies to changes in operations at ITC, ITC's cited Control Procedure policy applies to equipment for handling or storing chemicals. Because ITC's Control Procedure policy more closely aligns with the operations at issue, the Court finds it is the relevant policy. In the Control Procedure policy, ITC specifically listed the chemicals it applies to, which did not include naphtha and butane.

Accordingly, ITC did not voluntarily adopt the application of § 1910.119 to Tank 80-8's storage and transfer of butane and naphtha.

Moreover, the Court is unconvinced that by pledging membership in ACC's Responsible Care program and not delineating a PSM, ITC is bound by § 1910.119's requirements. Assuming without deciding whether ITC's ACC membership requires it to adopt a PSM, the Court does not find that in the absence of doing so, § 1910.119 applies to Tank 80-8. ITC's purported failure to identify a PSM does not lead to § 1910.119's applicability to Tank 80-8 by default, particularly when its express terms exclude the operations in question.

Based on the record, ITC did not voluntarily adopt § 1910.119's requirements for Tank 80-8's transfer and storage of naphtha and butane.[12]

### C.    Relevant to the Industry Standard of Care.

Plaintiffs argue that even if § 1910.119 does not apply by its own terms or was not the standard of care voluntarily adopted by ITC, their experts should still be permitted to opine on § 1910.119 because "the OSHA PSM is the industry standard" and "Texas case law supports the admission of regulatory standards like OSHA that describe the relevant standard of care in negligence actions." ECF Nos. 288 at 15; 290 at 10–11; *Munoz,* 4:19-cv-1460, ECF Nos. 1502 at 10–11; 1503 at 15.

---

[12] Similarly, the Court finds that Plaintiffs failed to show that an insurance policy from two years prior to the fire demonstrates that ITC adopted § 1910.199 as the PSM for Tank 80-8's operations.

They continue that "[e]xpert testimony outlining the tenants [sic] of the OSHA PSM and the policy reasons the industry is required to have such safety measures . . . is relevant and central to Plaintiffs' negligence case. Such testimony is, likewise, helpful to the jury in understanding the standard of care to which the industry expects reasonable terminal operators to comply." ECF No. 290 at 12; *Munoz,* 4:19-cv-1460, ECF No. 1502 at 12.[13]

The Court finds the opinion in *Matter of M&M Wireline & Offshore Services, LLC*, No. 15-5338, 2017 WL 480603, at *7 (E.D. La. Feb. 3, 2017) instructive. In *M&M Wireline*, the court excluded expert testimony that utilized an inapplicable OSHA regulation as evidence of the industry standard of care. *Id.* The court excluded this expert testimony because it found that the underlying OSHA regulation did not apply to the same "unsafe" circumstances present in the case before it—specifically, the OSHA regulation applied only to address certain hazards within the construction

---

[13] ITC seeks to exclude admission of the Elveston Affidavit, Chemical Safety Board Report, and ITC's OSHA citations and settlement from the trial, asserting that they were new, untimely, and irrelevant. *See* ECF No. 304 at 20; *Munoz,* 4:19-cv-1522, ECF No. 1522 at 20. As noted above, the Elveston Affidavit is both untimely under Federal Rule of Civil Procedure 26 and contains irrelevant expert testimony. *See* FED. R. CIV. P. 26(a)(2). By statute, the Chemical Safety Board Report is not admissible in evidence. 42 U.S.C. § 7412(r)(6)(G). OSHA citations are not relevant for the same reasons that OSHA does not expand the standard of care in a common law negligence case. *See Hill v. Consol. Concepts, Inc.*, No. 14-05-00345-CV, 2006 WL 2506403, at *4 (Tex. App.—Houston [14th Dist.] Aug. 31, 2006, pet. denied) ("our common law is not expanded by OSHA regulations."). Any settlement with a regulatory agency is inadmissible as well. *See Mays v. Chevron Pipe Line Co.*, No. CV 14-03098-BAJ-CBW, 2019 WL 13170166, at *1 (W.D. La. Jan. 16, 2019) (finding OSHA settlement inadmissible because "Federal Rule of Evidence 408 prohibits Plaintiffs from offering the settlement to prove the validity or amount of their claims.").

industry and the expert sought to utilize the regulation to establish the standard of care aboard a vessel. *Id.* Here, like in *M&M Wireline*, the underlying OSHA regulation does not apply to Tank 80-8's operations and therefore, the regulation is irrelevant as evidence of the industry standard of care. *See id.* Furthermore, Plaintiffs have not offered any authority that this regulation is relevant to the industry's standard of care under the present circumstances.[14] On the current record, the Court will not allow Mr. Elveston to testify that ITC had to comply with § 1910.119, an OSHA regulation that exempted the operations at issue, to comply with the industry standard of care.

Plaintiffs bear the burden to prove ITC violated the applicable standard of care to prove their negligence claim. As to the standard of care, the Court holds that

---

[14] Of the Texas cases cited by Plaintiffs through NSK's response, both courts found that OSHA regulations were relevant even though the circumstances before the courts did not involve an employer-employee relationship. The courts found that because the same unsafe circumstances were present, regardless of whether the actor was an employer, independent contractor, or other individual, then the OSHA regulations were relevant. The courts found that the OSHA standards reflected the cumulative wisdom of the industry on what is safe. *See Wal-Mart Stores, Inc. v. Seale*, 904 S.W.2d 718, 720–21 (Tex. App.—San Antonio 1995, no writ) ("The relevance of an OSHA standard is that it, and the ANSI standards which form the basis for most OSHA standards, are the cumulative wisdom of the industry on what is safe and what is unsafe. While OSHA was written to protect employees, an unsafe practice for an employee applies equally well to a customer who legitimately finds himself in the same geographic space as the employee."); *see also 4Front Engineered Sols., Inc. v. Rosales*, 512 S.W.3d 357, 386 (Tex. App.—Corpus Christi–Edinburg 2015), *rev'd*, 505 S.W.3d 905 (Tex. 2016) ("Evidence of OSHA regulations was relevant here because, as the cumulative wisdom of the industry on what is safe and what is unsafe, it was probative as to whether 4Front should have reasonably anticipated that an injury would be the consequence of lending a forklift to an untrained independent contractor who had been hired to repair an elevated sign.") (cleaned up). Here, OSHA has specifically exempted the transfer and storage operations of an atmospheric tank—Tank 80-8's operative functions—from its requirements under § 1910.119. Accordingly, these cases are inapposite.

§ 1910.119 is inapplicable to ITC's operations because the plain text of the regulation exempted the operations at issue, ITC did not voluntarily adopt § 1910.119's  requirements to apply to tanks holding chemicals not specified in the referenced appendix, and there is insufficient evidence before the Court to demonstrate that an otherwise inapplicable regulation provides the industry standard of care in this instance.

Because the Court finds Mr. Elveston's expert opinion should be excluded under Rule 702, the Court does not reach ITC's argument that this testimony should be excluded under Rule 403.

## IV.   CONCLUSION.

ITC's Motion to Exclude Expert Testimony Concerning Inapplicable OSHA Regulations. ECF No. 276; *Munoz,* 19-cv-1460, ECF No. 1474, is **GRANTED**. Mr. Elveston's proposed testimony regarding ITC's purported violations of § 1910.119 is **EXCLUDED** pursuant to Rule 702.

Signed on October 2, 2023, at Houston, Texas.

_____

**Dena Hanovice Palermo**
**United States Magistrate Judge**